UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | CAUSE NO. 3:20cr19(2) DRL |
| JOHN BRADSHAW, SR., | |
| Defendant. | |

OPINION AND ORDER

John Bradshaw requests compassionate release. The court generally "may not modify a term of imprisonment once it has been imposed," but may do so when "extraordinary and compelling reasons warrant" a reduction. 18 U.S.C. § 3582(c)(1)(A)(i). Release must satisfy the 18 U.S.C. § 3553(a) factors. *See* 18 U.S.C. § 3582(c)(1)(A); *United States v. Saunders*, 986 F.3d 1076, 1078 (7th Cir. 2021).

Over a five-month period, Mr. Bradshaw conspired to distribute sizeable amounts of heroin and methamphetamine. *See* 21 U.S.C. § 841(a)(1). In one cross-country trip alone in February 2020, he transported over 51 kilograms of methamphetamine and 1 kilogram of heroin. The court sentenced Mr. Bradshaw in September 2021 to 135 months. He has been continuously detained since his arrest on February 5, 2020, so he has served approximately 35 months of his sentence at this point. He is housed at FCI Terre Haute. He is scheduled for release September 5, 2029.

Mr. Bradshaw says he pursued his administrative remedy with the warden and attaches an email dated August 12, 2022. He notes that thirty days passed with no response. The government contests whether he exhausted his administrative remedy. *See United States v. Sanford*, 986 F.3d 779, 782 (7th Cir. 2021). The government reports that the Bureau of Prisons (BOP) could find no administrative review request from Mr. Bradshaw. His email request nonetheless has indicia of reliability, including date, time,

inmate number, and reference header to the facility's TRULINCS system through which communications occur, so the court credits the email and finds that Mr. Bradshaw exhausted his administrative remedy.

Mr. Bradshaw says his advanced age (66 years old), chronic heart failure, chronic obstructive pulmonary disease (COPD), and obesity expose him to extraordinary risk from COVID-19, particularly from the Omicron subvariants XBB.1.5, BA.4, and BA.5. Despite the court's grace for additional submissions from Mr. Bradshaw, he presents only general concerns about his medical condition, without medical evidence or explanation how his conditions, singularly or cumulatively, pose greater risk to him because of COVID-19. And he relies on largely general information about COVID-19's evolution and current status. That said, the court keeps working knowledge of the ongoing medical science in this area and has reviewed over 330 pages of medical records that the government tendered on Mr. Bradshaw.

Mr. Bradshaw has chronic heart conditions. A December 2021 chest radiograph revealed no congestive heart failure, perhaps contra his point, but other medical records reliably establish cardiac conditions of concern. He has had a cardiac pacemaker since a heart attack in 2018. He takes medication for atherosclerosis (cholesterol plaque in the arteries) that was diagnosed as mild in December 2021 and September 2022. Just last year, in July 2022, he had a second heart attack (non-ST-elevation type).

Mr. Bradshaw was recommended for a cardiology consultation because of the presence of troponin—a protein that appears when heart muscle experiences damage. A cardiologist noted moderate coronary artery disease and cardiomyopathy with significant left ventricular systolic dysfunction (making it harder for the heart to pump blood). The doctor elected to treat these conditions initially with medication and suggested that the future might require a pacemaker upgrade.

Still to this day, Mr. Bradshaw takes a diuretic (hydrochlorothiazide) and a nitrate (isosorbide mononitrate) that, among other conditions, address heart disease. His medical records thus confirm coronary artery disease, cardiomyopathy, a history of myocardial infarction (heart attack), and

2

hypertension. To the BOP's credit, Mr. Bradshaw has been receiving ongoing and regular care for these conditions, including at minimum on a monthly basis in 2022.

Mr. Bradshaw also claims to have chronic obstructive pulmonary disease (COPD). He reported the same condition at the time of his July 2021 presentence report, though nothing medically documented this condition then. A chest radiograph in December 2021 reported normal and clear lungs with no acute cardiopulmonary process. During examination in July 2022, one physician noted that COPD was "questionable." His medical records since, including in September 2022, have continued to note the questionable nature of it.[1] The court appreciates that the judicial system cannot expect certainty out of an uncertain pandemic and coronavirus condition, but Mr. Bradshaw has a burden—and that burden must deal at least in probabilities to secure the extraordinary relief of compassionate release, not speculation. *See United States v. Newton*, 996 F.3d 485, 488-89 (7th Cir. 2021). On this record, the court does not credit the presence of COPD, though this finding has no material effect on the outcome.

Mr. Bradshaw also points to his obesity. At recent report in August 2022, he stood at 5'9" and weighed 213 pounds. This translates to a body mass index of 31.5. His treating physician at the time characterized this as "no obesity," though the court notes that the Centers of Disease Control and Prevention (CDC) and other medical resources would call this mild obesity. Based on statistics alone, obesity is more common than extraordinary within the federal prisoner ranks, and the BOP is equipped to deal with such commonplace medical conditions. But the court credits this condition as one of several medical issues that cumulatively make Mr. Bradshaw's health situation more extraordinary than not.

The CDC reports that having "heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and possibly high blood pressure (hypertension) can make you more likely to get very

---

[1] Medical records from an August 2022 examination report a history of COPD without including the prior "questionable" annotation.

sick from COVID-19."[2] These are the very conditions that Mr. Bradshaw has—heart failure, coronary artery disease, cardiomyopathy, and hypertension. Add to that his increased risk because of his age (one of the strongest risk factors)[3] and mild obesity,[4] and it proves difficult to say his risk of illness from COVID-19 in light of his conditions is less than extraordinary.

Mr. Bradshaw has been vaccinated and has received two boosters. From the medical science, this provides measurable protection against COVID-19,[5] though perhaps not in all its variants. The BOP has taken well-documented steps to treat his medical conditions; and, absent the variable of COVID-19, Mr. Bradshaw has not presented any evidence that his medical conditions, singularly or together, substantially diminish his ability to provide self-care within the facility, to receive medical care from professionals, or to recover from a health condition. He exceeds 65 years of age, but he isn't experiencing a serious deterioration in physical health, nor has he served 75 percent of his sentence (or 10 years). But this commentary from U.S.S.G. § 1B1.13 is mere guidance.

The reality is that COVID-19 remains an evolving variable, and that reality together with Mr. Bradshaw's myriad conditions and age expose him medically to risk. For instance, in early 2022, an Omicron subvariant called BA.2 began to spread faster than other Omicron subvariants, followed by BA.4 and BA.5, only to be outdone by the BQ subvariants. Now in early 2023, a new rising Omicron subvariant called XBB.1.5 appears to be the most transmissible strain of the virus to date.[6] Experts are still trying to better understand XBB.1.5 and other Omicron subvariants, such as BQ1.1. and BA.5.

---

[2] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

[3] *See* https://www.cdc.gov/aging/covid19/covid19-older-adults.html.

[4] *See* https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-care/underlyingconditions.html.

[5] "People 65 and older who received both doses of either Pfizer or Moderna vaccines showed a 94% reduced risk of COVID-19 related hospitalization." *See* https://www.cdc.gov/aging/covid19-guidance.html (emphasis omitted).

[6] *See* https://www.yalemedicine.org/news/covid-19-variants-of-concern-omicron.

The Food and Drug Administration (FDA) has authorized bivalent vaccine booster shots from Pfizer-BioNTech and Moderna for most people. "Bivalent means the shot protects against two strains of a virus, and these COVID-19 boosters are designed to protect against both the original SARS-CoV-2 virus and the Omicron BA.4 and BA.5 subvariants (although experts are still learning about its effectiveness against some of the latest subvariants)."[7] Based on current science, experts don't view the overall phenotype of XBB and BQ.1 to diverge enough from each other, or from other Omicron lineages with immune escape mutations, to warrant the designation of new variants of concern.[8]

But their ability to evade antibodies, either from prior infection or immunization, remains a worry for study. Dr. David Ho, a professor of microbiology and immunology at Columbia University, recently tested viruses engineered to have the spikes of XBB and XBB.1 as well as BQ.1 and BQ1.1 against such antibodies, including persons who received the bivalent vaccines. The study also tested 23 monoclonal antibody treatments against these new subvariants. He found that XBB.1 was the slipperiest of them all.[9] "Recent BQ and XBB subvariants of SARS-CoV-2 demonstrate dramatically increased ability to evade neutralizing antibodies, even those from people who received the bivalent mRNA booster or who are immunized and had previous breakthrough Omicron infection."[9] For that very reason, boosters will likely evolve, as they have already, to help address these new strains; and Mr. Bradshaw will continue to benefit, as he has already, from their provision. After all, "vaccines provide a much better defense against infection than any judicial order could do." *United States v. Ugbah*, 4 F.4th 595, 597 (7th Cir. 2021).

But until then, and though he has received the vaccine and two boosters, the court cannot confidently say how his body, given his medical conditions, might respond to such an infection if he were

---

[7] *See* https://www.yalemedicine.org/news/5-things-to-know-omicron.

[8] *See* https://www.who.int/news/item/27-10-2022-tag-ve-statement-on-omicron-sublineages-bq.1-and-xbb.

[9] *See* https://www.cell.com/cell/pdf/S0092-8674(22)01531-8.pdf?_returnURL=https%3A%2F%2Flinkinghub.elsevier.com%2Fretrieve%2Fpii%2FS0092867422015318%3Fshowall%3Dtrue; *see generally* https://www.cnn.com/2023/01/03/health/covid-variant-xbb-explainer/index.html.

5

to contract it. That said, he resides at FCI Terre Haute that today has no active prisoner COVID-19 cases out of over 1400 inmates—a rather remarkable accomplishment and quite telling given the added risks of congregate housing and these winter months. Of course, more vaccinations have been administered at the facility than there are prisoners, which undoubtedly has helped, as have other reasonable measures of masking and quarantining of the occasional infected inmate.

The BOP has been undeterred in its handling of the COVID-19 pandemic, including at FCI Terre Haute. To that point, Mr. Bradshaw has been in federal custody since February 2020, and throughout the pandemic's spread and height, and never has contracted the coronavirus. That doesn't mean that past will be prologue, but there is no outbreak at the facility today. No physician has advocated for his release given the risk. Notwithstanding recent trends in certain parts of the country from the Omicron variants, this facility proves no worse than the outside world. These real-time facts, appreciating their ability to evolve, work against a finding that Mr. Bradshaw's conditions, extraordinary as they may be, present a compelling case for early release.

The § 3553(a) factors also firmly militate against compassionate release. Mr. Bradshaw transported over 51 kilograms (over 110 pounds) of methamphetamine and 1 kilogram of heroin during one trip from California to Indiana; but this trip represented one of several in which he admitted transporting similar weights of drugs. This conspiracy involved large-scale distribution of some of the worst kinds of drugs that have devastating effects on our communities. *See* 18 U.S.C. §§ 3553(a)(1), (a)(2)(A), (a)(2)(C); *see, e.g.,* Nat'l Inst. on Drug Abuse, *Methamphetamine Research Report* 2 (2019).

Mr. Bradshaw cites his age as mitigating—age 65 when sentenced and age 66 now. Recidivism often decreases with age, but age can "cut both ways." United States Sent. Comm'n (USSC), *Older Offenders in the Federal System* 8 (2022) (quoting *United States v. Pacheco-Martinez*, 791 F.3d 171, 180 (1st Cir. 2015)). Over several decades, he amassed an extensive criminal history that amounts to twelve incidents of violence, four drug convictions, and multiple crimes involving firearms. Though a notable gap exists in

6

his history after his release from parole in 2014, his criminal history category only reflects some of many convictions that otherwise aged out under the guidelines, and indeed only convictions after age 45; and he committed this drug conspiracy at age 63 after other convictions in his 50s. *See* 18 U.S.C. § 3553(a)(1).

Mr. Bradshaw's resolve to engage in crime late in life tends to prove the recidivism statistics too rosy and raises the legitimate concern that he may be one of the few whose criminality persists until the clock of life intervenes. *See* 18 U.S.C. §§ 3553(a)(1), (a)(2)(B); *see also United States v. Johnson*, 685 F.3d 660, 662 (7th Cir. 2012); USSC, *Recidivism of Federal Drug Trafficking Offenders Released in 2010* 32, 111 (2022) (15 percent rearrest rate for drug offenders ages 60 years and older in CHC IV) (55.4 percent rearrest rate for methamphetamine traffickers with eight criminal history points). His poor health mitigates the recidivism risk to a degree, though not enough to prevent him from committing this large-scale drug conspiracy in his 60s, and not measurably enough today to justify early release. Incapacitation becomes unfortunately inevitable when rehabilitation and deterrence prove unworkable.

Mr. Bradshaw had some advantages that many defendants in federal court lacked—a good childhood, two involved parents, a home free from substance and physical abuse, the freedom to play sports, and weekly church. Education has often eluded his near grasp, and only disability payments and drug courier fees financed his life before his arrest. That gives little comfort that there will be strong roots to prevent his return to crime, though the court notes his resolve, commendable as it is, to largely stop personal use of drugs since 2003. *See* 18 U.S.C. § 3553(a)(1).

Mr. Bradshaw has a huge family—eleven adult children and thirty-two grandchildren—and no shortage of family support, but the court lacks the confidence that these ties will ground him against crime when they failed to do so just three years ago. *See* 18 U.S.C. § 3553(a)(1). The need for just punishment and the need to protect the public remain reasonable aims today. *See* 18 U.S.C. §§ 3553(a)(2)(A), (a)(2)(C). Service of 35 months is but a nominal answer to the seriousness of his offenses and the call for incapacitation and our community's protection. *See id.*

The court has no record of self-improvement during Mr. Bradshaw's incarceration that would add to this picture. *See* 18 U.S.C. § 3553(a)(1). He says he has changed his ways, and the court remains hopeful that this continues as a growing truth, but rehabilitation alone cannot generally be considered an extraordinary and compelling reason, *see* 28 U.S.C. § 994(t); *United States v. Peoples*, 41 F.4th 837, 841-42 (7th Cir. 2022), nor particularly on this record. In total, the § 3553(a) factors preclude compassionate release.

Accordingly, the court DENIES the motion for compassionate release [ECF 139, 147], DENIES the motion for appointment of counsel [ECF 147], and GRANTS the motion to seal [ECF 148].

SO ORDERED.

January 18, 2023                    *s/ Damon R. Leichty*
                                    Judge, United States District Court